# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
*In re* : Chapter 11
:
ADVANTA CORP., *et al.*, : Case No. 09-13931 (KJC)
:
Debtors.[1] : (Jointly Administered)
:
: Hearing Date: June 8, 2010 at 10:00 a.m.
: Objection Deadline: June 1, 2010 at 4:00 p.m.
------------------------------------------------------------x

## MOTION FOR AUTHORITY
## TO (I) SELL ASSETS OF BIZEQUITY CORP.
## FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES;
## (II) ASSUME AND ASSIGN CERTAIN CONTRACTS; AND (III) CHANGE NAME

BizEquity Corp. ("***BizEquity***"), as debtor and debtor in possession, respectfully

represents:

### Relief Requested

1. By this motion (the "***Motion***"), BizEquity seeks entry of an order

substantially in the form annexed hereto as ***Exhibit A*** (i) authorizing, pursuant to section 363 of

the Bankruptcy Code, the sale (the "***Sale***") of the Assets (as defined herein) to EMG

---

[1] The Debtors in these jointly administered chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Advanta Corp. (2070), Advanta Investment Corp. (5627), Advanta Business Services Holding Corp. (4047), Advanta Business Services Corp. (3786), Advanta Shared Services Corp. (7074), Advanta Service Corp. (5625), Advanta Advertising Inc. (0186), Advantennis Corp. (2355), Advanta Mortgage Holding Company (5221), Advanta Auto Finance Corporation (6077), Advanta Mortgage Corp. USA (2654), Advanta Finance Corp. (8991), Advanta Ventures Inc. (5127), BizEquity Corp. (8960), Ideablob Corp. (0726), Advanta Credit Card Receivables Corp. (7955), Great Expectations International Inc. (0440), Great Expectations Franchise Corp. (3326), and Great Expectations Management Corp. (3328). Information regarding the Debtors' businesses and the background relating to events leading up to these chapter 11 cases can be found in (i) the Declaration of William A. Rosoff in Support of the Debtors' Chapter 11 Petitions and First-Day Motions, filed on November 8, 2009 (the "***Rosoff Declaration***"), the date the majority of Debtors filed their petitions under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), and (ii) that certain supplement thereto, filed on November 20, 2009, the date Advanta Ventures Inc., BizEquity Corp., Ideablob Corp. and Advanta Credit Card Receivables Corp. filed their chapter 11 cases. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Further, in accordance with an order of this Court, the Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

RLF1 3572903v. 1

Technologies, LLC (the "*Buyer*") free and clear of all liens, claims, security interests and encumbrances pursuant to that certain Asset Purchase Agreement with the Buyer in substantially the form annexed hereto as *Exhibit B* (the "*APA*"); (ii) granting the Buyer the protections afforded a good faith purchaser by section 363(m) of the Bankruptcy Code; (iii) authorizing BizEquity to assume certain Assumed Contracts (as defined in the APA), a list of which is annexed hereto as *Exhibit C*, and to assign the Assumed Contracts to the Buyer pursuant to the APA; and (iv) in accordance with the APA, authorizing BizEquity to change its name to "BE Corp."

2. BizEquity also seeks permission to reimburse the Buyer for its actual out-of-pocket fees, costs, and expenses incurred in connection with the negotiation, drafting, execution and delivery of the APA, including the fees, costs, and expenses of the Buyer's legal counsel and advisors, as reflected on invoices provided by the Buyer to BizEquity, if the Buyer is outbid by another party, if any, that submits a higher or better offer for the Assets (the "*Alternative Buyer*"), and BizEquity sells the Assets to the Alternative Buyer (the "*Termination Fee*"). (*See* APA § 8.2(b)).

3. In addition, to realize the sale in a more expeditious manner, BizEquity requests that any order approving the sale be effective immediately, and the Court waive any stay pursuant to Bankruptcy Rules 6004 and 6006 (as applicable).

### Sale of BizEquity Assets

4. BizEquity previously operated a website at www.bizequity.com (the "*Website*") targeting small business owners, and providing them with tools and information to help determine the estimated value of their businesses. On December 18, 2009, the Website was taken offline as a result of BizEquity's chapter 11 filing. Since that date, BizEquity has

continued to pay certain internet domain registration fees, and other costs and expenses, to maintain the value of the Website and related assets.

5. In December 2009, BizEquity contacted ten third-parties thought to be likely acquisition candidates for BizEquity's assets based on their financial resources and familiarity with BizEquity's operations. BizEquity requested from such parties expressions of interest relating to the acquisition of BizEquity or its assets. Based on this request, BizEquity received five expressions of interest from prospective purchasers. Upon execution of non-disclosure agreements by the prospective purchasers, BizEquity provided the prospective purchasers with an information package giving an overview of the BizEquity assets available for sale. Following this step, four of the prospective purchasers indicated a willingness to begin due diligence with respect to the purchase of BizEquity's assets.

6. BizEquity held an online due diligence and auction process for these four prospective purchasers from April 14, 2010 through May 3, 2010 (the "*Auction Period*"), with all bids due by 5:00 p.m. (prevailing Eastern Time) on May 3, 2010. During the Auction Period, BizEquity made available further operational, technical and other due diligence materials relating to its assets, and also provided the prospective purchasers with a form of asset purchase agreement. During the Auction Period, BizEquity also received certain follow-up due diligence questions from the prospective purchasers, and responded to these in turn.

7. By the end of the Auction Period, BizEquity received three bids for its assets, while the fourth participant declined to bid. Entrepreneurs Management Group LLC, an affiliate of the Buyer, submitted a bid of $106,000, along with minimal and acceptable revisions to the form asset purchase agreement, on behalf of the Buyer (the "*EMG Bid*"). After due consideration of each of the three bids received, BizEquity selected the EMG Bid, subject to

3

finalizing the asset purchase agreement and receiving Court approval for the Sale, given that the EMG Bid was financially superior, and was otherwise reasonable in terms of amendments to the form of APA provided.

8. The salient terms of the APA, a copy of which is annexed hereto as *Exhibit B*, are as follows:[2]

- **Purchase and Sale of Assets**: The Buyer has agreed to purchase all of the right, title and interest in and to all of the assets referred to in section 1.1 of the APA (the "*Assets*") from BizEquity. The Assets include, but are not limited to, BizEquity's (a) intellectual property; (b) software and other code; (c) internet URLs and domain names; (d) Website and other websites; (e) customer, costs and other information; (f) written technical information, data, and research and development information; and (g) certain Assumed Contracts. The Assets specifically exclude BizEquity's license to data from the National Business Database of Experian Information Services under an amendment, dated March 1, 2009, to the Business Marketing Services Master Agreement, dated February 28, 2000, between Experian Information Solutions, Inc. and Advanta Business Services Corp.

- **Payment of Purchase Price**: The purchase price is $106,000.00 (the "*Purchase Price*"). The Buyer will pay the Purchase Price in full by wire transfer of immediately available funds at Closing (as defined in the APA).

- **Cure Amounts**: At Closing, BizEquity is to pay such amounts determined by the Court to be necessary to cure monetary defaults, if any, and to pay for all actual or pecuniary losses that have resulted from any defaults, under the Assumed Contracts, over and above a floor of $2,500.00. The Buyer shall be responsible for all cure amounts up to the $2,500.00 floor.

- **Conditions Precedent to Obligations**: Closing is contingent on an order of the Court that: (i) authorizes the transfer of the Assets to the Buyer free and clear of all Encumbrances (as defined below), and determines that the Buyer is a good faith purchaser under 11 U.S.C. Section 365(m); and (ii) authorizes the assumption and assignment of the Assumed Contracts to the Buyer. BizEquity is also required to deliver certain documentation, including trademark assignments, at Closing.

---

[2] This summary is qualified in its entirety by reference to the provisions of the APA. Unless otherwise defined herein, capitalized terms have the meanings ascribed to such terms in the APA.

4

- **No Encumbrances:** Subject to this Court's approval of the APA, the sale of the Assets to the Buyer will be free and clear of any and all claims, liens, encumbrances, judgments, and security interests ("*Encumbrances*").

- **Name Change:** As promptly as practicable following the Closing, BizEquity is required to either change its name or dissolve, and will not otherwise be permitted to use in commerce the name "BizEquity Corp."

- **Termination:** The APA may be terminated: (a) by mutual written consent of both parties; (b) by either party if required by law; (c) subject to certain conditions, if Closing does not occur on or before July 31, 2010; (d) by BizEquity, subject to certain conditions and limitations, if BizEquity receives a proposal from a third party to acquire all or substantially all of its assets or all or substantially all of its equity securities or assets, on terms which BizEquity's board of directors determines in good faith to be more favorable than the Sale (a "*Superior Company Proposal*"); and (e) by the Buyer, if the Court does not approve the Termination Fee (as defined below).

- **Termination Fee:** Should BizEquity receive a Superior Company Proposal and accept it, then upon termination of the APA, BizEquity shall pay the Buyer a termination fee (the "*Termination Fee*") in an amount equal to any and all out-of-pocket fees, costs and expenses incurred by the Buyer in connection with the negotiation, drafting, execution and delivery of the APA, including the fees, costs and expenses of the Buyer's advisors and legal counsel, as reflected on invoices provided by the Buyer to BizEquity, by wire transfer of immediately available funds no more than three (3) Business Days after the later of the date of such termination and the date on which the Buyer provides BizEquity with wire transfer instructions and such invoices.

## Relief Requested Is Warranted and in the Best Interests of BizEquity and its Estate

### A. Good Business Reasons Support BizEquity's Decision to Sell the Assets

9. Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is a "good business reason" that justifies such action. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of

5

*Lionel Corp.* and requiring good faith); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 178 (D. Del. 1991) (affirming decision permitting debtor to sell assets where sound business reasons supported the sale); *In re Allegheny Int'l*, 117 B.R. 171 (W.D. Pa. 1990) (affirming bankruptcy court order allowing debtor to enter into financing arrangement because debtor provided good business reason for use of estate property pursuant to section 363(b)).

10. Good business reasons support BizEquity's decision to sell the Assets. BizEquity is in the process of winding down its operations, and as a result has taken the Website offline, and no longer invests or otherwise develops the Website or needs the other Assets. Given the speed at which internet-based technologies evolve, the Assets require ongoing development and maintenance to maintain or increase their relevance and value, both to BizEquity's estate, to prospective purchasers, and to customers and end-users of the Website. A failure to sell the Assets in a timely manner will result in the Assets depreciating in value, to the detriment of BizEquity and its estate. The net benefit to BizEquity's estate of consummating the Sale is approximately $106,000.00. The EMG Bid, or any Superior Company Proposal consummated, will therefore realize a greater return to BizEquity's estate than retaining the Assets or a liquidation of BizEquity, affording BizEquity with additional liquidity during its chapter 11 cases and providing for a greater recovery to creditors.

11. Accordingly, BizEquity has determined in its sound business judgment that the Sale pursuant to the APA and on the terms proposed in this Motion is in the best interests of BizEquity, its estate, and its creditors.

## B. Auction of the Assets Is Not Required

12. In accordance with Bankruptcy Rule 6004(f)(1), asset sales outside of the ordinary course of business may be by private or public sale. FED. R. BANKR. P. 6004(f)(1). A debtor has broad discretion in determining the manner in which its assets are sold. *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . ."); *In re Bakalis*, 220 B.R. at 531 (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property") (internal quotations and citations omitted). As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment. *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate." (internal citations omitted)); *In re Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). Accordingly, if a debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interest of the estate, the debtor should be permitted to do so. *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

7

13. BizEquity has already engaged in a reasonable and thorough sale process for the Assets. As a result of the private auction carried out by BizEquity, BizEquity believes that it is in the best interests of its estate to accept the EMG Bid and consummate the Sale, and that a public auction will result in unnecessary additional costs to its estate that will likely yield no higher or better offers.

14. In light of the foregoing, BizEquity respectfully requests that, pursuant to section 363(b) of the Bankruptcy Code, the Court authorize the sale of the Assets as provided for herein.

### C. Sale of the Assets of BizEquity Free and Clear of Liens, Claims, and Encumbrances Is Appropriate

15. BizEquity further submits that it is appropriate that the Assets be sold free and clear of liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the sale proceeds thereof. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, when selling property of the estate it is only necessary to meet one of the five conditions of that section. 11 U.S.C. §

8

RLF1 3572903v. 1

363(f). *See In re Kellstrom Indus. Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive. Therefore, if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens." *citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)).

16. BizEquity does not believe that any entity has a lien on the Assets. Nonetheless, with respect to any party asserting a lien, claim encumbrance, or other interest in the Assets, BizEquity anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f). Thus, the sale of the Assets free and clear of liens, claims, encumbrances, and other interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

**D.     Protections as a Good Faith Buyer**

17. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day,*

*Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

18. The Sale is the result of arm's length, good-faith negotiations with the Buyer. The Buyer has not, in connection with the proposed transaction, engaged in any conduct that constitutes a lack of good faith. Accordingly, the Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code. *See In re Gucci*, 126 F.3d 380 (2d Cir. 1997) (a good faith purchaser is shown by integrity of his conduct during the course of the sale proceedings); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing *Gucci*, 126 F.3d 380); *Cmty. Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders). In addition, neither BizEquity nor the Buyer have engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the transactions contemplated by the APA.

### E. Termination Fee Is Warranted and Should be Approved

19. In connection with the Sale, BizEquity is seeking authorization to pay the Termination Fee described herein, if necessary. Approval of termination fees as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery by allowing other bids to be made. *See, e.g., In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr.

10

S.D.N.Y. February 22, 2008) (approving break-up fee); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement). Bankruptcy courts have approved bidding incentives similar to the Termination Fee under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of sound business judgment.

20. Here, the Termination Fee meets the "business judgment rule" standard. The Termination Fee is fair and reasonable in amount, particularly in view of the efforts that have been and will have to be expended by the Buyer to purchase the Assets. Moreover, the Termination Fee will enable BizEquity to allow competing bids to be made in the form of a Superior Company Proposal, which may be materially higher or otherwise better than the EMG Bid, a clear benefit to BizEquity's estate.

21. BizEquity submits that the proposed Termination Fee will not chill bidding, is reasonable, and its availability to BizEquity will enable BizEquity to maximize the value of its estate. Accordingly, BizEquity should be authorized to pay the Termination Fee

11

pursuant to the terms of the APA if a Superior Company Proposal is made and accepted by BizEquity, and BizEquity deems payment of the Termination Fee necessary in its business judgment.

F.   **Assumption and Assignment of the Assumed Contracts Is Warranted under Section 365 of the Bankruptcy Code**

   *(i)   Assumption and Assignment of the Assumed Contracts Is Within BizEquity's Business Judgment*

   22.   Pursuant to the APA, BizEquity is required to seek to assume the Assumed Contracts and the obligations thereunder, and to subsequently assign the Assumed Contracts to the Buyer. Section 365 of the Bankruptcy Code provides as follows:

> (a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

*See* 11 U.S.C. §§ 365(a), (b)(1). Accordingly, section 365 authorizes the proposed assumption of the Assumed Contracts by BizEquity. The assumption of a contract by a debtor is subject to review under the business judgment standard. *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the unexpired contract. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment").

   23.   The business judgment rule shields a debtor's management from judicial second-guessing. *Id.; In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, when applying the "business judgment" rule, courts show great deference to a debtor's decision to assume a contract. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume an executory contract "should be granted as a matter of course"). Thus, this Court should approve the assumption of the Assumed Contracts if BizEquity is able to demonstrate a sound business justification therefor. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

24. As noted above, the assumption of the Assumed Contracts is required so that they may be assigned to the Buyer pursuant to the APA. BizEquity has carefully reviewed the economic benefits of assumption and assignment of the Assumed Contracts and believes that its decision to assume the Assumed Contracts is within BizEquity's sound business judgment, as the assumption of the Assumed Contracts will permit the consummation of the Sale, thereby benefiting BizEquity's estate in the amount of the Purchase Price, while avoiding any future liability under the Assumed Contracts. Accordingly, BizEquity believes that assuming the Assumed Contracts is in the best interests of BizEquity's estate, its creditors, and all other parties in interest.

(ii) *Buyer and BizEquity Will Pay Cure Amounts, If Any*

25. The APA provides that, to the extent that any cure payments are required, the Buyer will pay all cure amounts up to and including $2,500.00 in the aggregate, and thereafter, BizEquity will be required to pay the balance of the cure amounts, if any. Section 365 of the Bankruptcy Code provides as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure such default;
> >
> > (B) compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease. . . .

*See* 11 U.S.C. §§ 365(b)(1).

26. Accordingly, section 365 authorizes the proposed assumption of the Assumed Contracts, provided that any defaults under the Assumed Contracts are cured, or adequate assurance is given by the debtor that the default will be promptly cured. To the best of BizEquity's knowledge, there have been no performance, financial or other defaults under the Assumed Contracts that need to be cured, and therefore no cure amounts are owed. The Assumed Contracts Counterparties (as defined in *Exhibit C* hereto) are being served with this Motion, and will have the opportunity to object if they believe otherwise. Should a cure amount be owed, the APA contains a mechanism for apportioning any liability for cure amounts as described above.

*(iii) BizEquity Can Demonstrate Adequate Assurance of Future Performance*

27. Section 365 of the Bankruptcy Code provides as follows:

(f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if —

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*See* 11 U.S.C. §§ 365(f)(2).

28. Thus, in addition to the above, provided that adequate assurance of future performance is provided to the Assumed Contracts Counterparties, BizEquity may assign the Assumed Contracts to the Buyer once they have been assumed by BizEquity.

29. The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (*quoting Cinicola*, 248 F.3d at 120 n. 10); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

30. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has

financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid); *see also In re Vitanza*, Case No. No. 98-19611 (DWS), 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

31. As set forth above, BizEquity will be assuming and assigning the Assumed Contracts to the Buyer, who was initially selected due to its financial condition and ability to consummate the Sale. BizEquity submits that the Buyer's financial condition provides sufficient adequate assurance, and that the assignment of the Assumed Contracts to the Buyer as part of the Sale should be approved.

### G. BizEquity Should be Authorized to Effectuate Its Name Change

32. Section 6.6 of the APA provides as follows:

> Name Change. As promptly as practicable following the Closing, Seller will change its name or dissolve and will not otherwise use in commerce the name "BizEquity Corp."

33. Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and further that "no provision of this title shall be construed to preclude the court from . . . taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules." 11 U.S.C. § 105(a). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Gilman v. Continental Airlines*, 254 B.R. 93, 97 (Bankr. D. Del. 1998) (holding that section 105(a) gives a bankruptcy court discretion to issue any order, process or judgment that is "necessary or appropriate to carry out the purposes of the Bankruptcy

RLF1 3572903v. 1

Code, which was intended to provide protection to debtors."), *rev'd on other grounds*, 203 F.3d 203 (3rd Cir. 2000); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern."); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("the bankruptcy court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

34. As noted above, the APA requires BizEquity to change its name as a result of the Sale. Approval of the name change by the Court is required to enable BizEquity to effectuate its name change under Section 303 of the General Corporation Law of the State of Delaware (the "***Delaware Corporation Law***"). Section 303 of the Delaware Corporation Law provides that a corporation incorporated in Delaware which has commenced a case under the Bankruptcy Code "may put into effect and carry out any decrees and orders of the court or judge in such bankruptcy proceeding and may take *any corporate action* provided or directed by such decrees and orders, *without further action by its directors or stockholders*," including, "amend[ing] its articles of incorporation" to, among other things, effectuate a change of name. 8 Del. Code § 303(a), (b). Accordingly, BizEquity seeks approval of the Court to change its name to "BE Corp." (the "***Name Change***").

35. In addition, to effectuate the Name Change, BizEquity requests that the Court authorize the Clerk of the United States Bankruptcy Court for the District of Delaware to take whatever actions are necessary to update the ECF filing system to reflect the Name Change.

17

36. Courts in this district have entered similar orders authorizing the change of corporate names. *See, e.g., In re SN Liquidation, Inc.*, Chapter 11 Case No. 07-11666 (KG) (Bankr. D. Del. January 29, 2008) (authorizing change of debtor's name and caption from Inphonic, Inc. to SN Liquidation, Inc. after a sale of substantially all of the debtors' assets); *In re NII Holdings, Inc.*, 288 B.R. 356, 373 (Bankr. D. Del. 2002) (holding that "[p]ursuant to section 1142(b) of the Bankruptcy Code and section 303 of the Delaware General Corporate Law . . . the Debtors . . . are authorized to: (i) cause to be filed with the Secretary of State of the State of Delaware . . . (B) certificates of incorporation . . . or certificates or articles of amendment thereto); *In re Vencor, Inc.*, 2001 WL 34135323, at *12 (Bankr. D. Del. 2001) (holding that debtors were authorized under section 303 of the Delaware Corporation Law to "take any and all actions reasonably necessary to implement the transactions contemplated by the Confirmation Order, including . . . amend[ing] . . . the certificates of incorporation . . . to effectuate a change of name . . . ." all without further corporate action or action by stockholders.).

37. Accordingly, BizEquity's request to change its corporate name is necessary, appropriate, and in the best interest of its estate and creditors.

### Waiver of Bankruptcy Rules 6004 and 6006

38. BizEquity seeks as prompt a Closing as possible to preserve and maximize its recovery from the proposed transaction. In light of the foregoing, BizEquity requests that any order approving the Sale be effective immediately by waiving any stay pursuant to Bankruptcy Rule 6004.

### Jurisdiction

39. This Court has jurisdiction to consider this matter and grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. A proceeding to consider and grant

18

RLF1 3572903v. 1

such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Notice

40. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the statutory committee of unsecured creditors; (iii) Bank of New York Mellon, as trustee under the Investment Note Indenture, and Law Debenture Trust Company of New York, as trustee under the 8.99% Indenture (both as defined in the Rosoff Declaration); (iv) the Buyer; (v) the Assumed Contracts Counterparties; and (vi) those parties who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "*Notice Parties*"). BizEquity respectfully submits that no further notice of this Motion is required.

### No Prior Request

41. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, BizEquity respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: May 18, 2010
Wilmington, Delaware

/s/ Mark D. Collins

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Chun I. Jang (No. 4790)
Zachary I. Shapiro (No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Robert J. Lemons
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION